# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

SHAWN HIGGINS                                                     CIVIL ACTION

versus                                                                  NO. 09-2632

BURL CAIN, WARDEN                                            SECTION: "S" (3)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of

conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed

findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C)

and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States

District Courts.  Upon review of the record, the Court has determined that this matter can be

disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the

following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH**

**PREJUDICE**.

Petitioner, Shawn Higgins, is a state prisoner incarcerated at the Louisiana State

Penitentiary, Angola, Louisiana.  On May 10, 2002, he was convicted of first degree murder in

violation of Louisiana law.[1]  On November 8, 2002, he was sentenced to death.[2]  On April 1, 2005, the Louisiana Supreme Court reversed his conviction and sentence; however, the court remanded the matter and directed trial court to enter a judgment of guilty of second degree murder and to resentence petitioner to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[3]  The trial court complied with that order on May 20, 2005.[4]  The United States Supreme Court then denied petitioner's related petition for a writ of certiorari on October 3, 2005.[5]  On April 21, 2006, the trial court, on petitioner's motion, vacated his sentence; however, the court then immediately again resentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[6]

On April 10, 2007, petitioner, through counsel, filed with the state district court an application for post-conviction relief.[7]  That application was denied on September 5, 2007.[8]

---

[1] State Rec., Vol. XXI of XXV, transcript of May 10, 2002, p. 80; State Rec., Vol. VI of XXV, minute entry dated May 10, 2002.

[2] State Rec., Vol. XXII of XXV, transcript of November 8, 2002, p. 33; State Rec., Vol. VI of XXV, minute entry dated November 8, 2002.

[3] State v. Higgins, 898 So.2d 1219 (La. 2005) (No. 2003-KA-1980); State Rec., Vol. VII of XXV.

[4] State Rec., Vol. VII of XXV, minute entry dated May 20, 2005.

[5] Higgins v. Louisiana, 546 U.S. 883 (2005) (No. 05-5104); State Rec., Vol. II of XXV.

[6] State Rec., Vol. VII of XXV, minute entry dated April 21, 2006.

[7] State Rec., Vol. VIII of XXV.

[8] State Rec., Vol. VIII of XXV, Order dated September 5, 2007.

Petitioner's related writ applications were then denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[9] and by the Louisiana Supreme Court on January 30, 2009.[10]

Petitioner, through counsel, filed the instant *habeas corpus* petition on February 9, 2009.[11]  In support of his petition, he asserts the follows claims:

1. The state failed to disclose to the defense evidence as required by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny;

2. Petitioner received ineffective assistance of counsel;

3. Petitioner's constitutional rights were violated by the jury's consideration of evidence not admitted at trial;

4. The trial court erred in failing to grant petitioner's motion to suppress the identification;

5. The trial court infringed upon petitioner's right to compulsory process and his right to present a defense by excluding expert testimony concerning the causes of misidentification;

6. There was insufficient evidence to support the conviction;

---

[9] Higgins v. Cain, No. 07-KH-778 (La. App. 5th Cir. Dec. 7, 2007) (unpublished); State Rec., Vol. VII of XXV.

[10] State *ex rel.* Higgins v. State, 999 So.2d 741 (La. 2009) (No. 2008-KP-0051); State Rec., Vol. VIII of XXV.

[11] Rec. Doc. 1.

7.      Petitioner's conviction is unconstitutional because evidence

        unavailable at trial demonstrates that he is actually innocent;

        and

8.      The trial court erred in denying a challenge for cause.

        The state challenges neither the timeliness of the federal application nor petitioner's

exhaustion of his state court remedies.[12]

### Standard of Review

        The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.

Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact,

questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the

claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under

§ 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481,

485 (5th Cir. 2000).

        As to questions of law and mixed questions of law and fact, a federal court must defer

to the state court's decision unless it "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

        § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses
        have independent meaning.  A federal habeas court may issue the
        writ under the "contrary to" clause if the state court applies a rule

---

[12] Rec. Doc. 14, pp. 5-6 and 7-8.

different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1); Hill, 210 F.3d at 485.

Facts

On direct appeal, the Louisiana Supreme Court summarized the facts of this case as follows:

On the night of October 24, 1998, Donald Price cashed in his winnings at Boomtown Casino in Harvey, and drove his white Ford Explorer to Marrero. Security cameras obtained from the casino indicate that Price left the building at 11:54 p.m. At 12:13 a.m. on October 25th, less than 20 minutes after Price was recorded leaving the casino, police received a 911 call indicating someone had been shot on Cross Street between Second Avenue and the Westbank Expressway in Marrero. At approximately 12:16 a.m., a Jefferson Parish Sheriff's Officer arrived on the scene and found Price's lifeless body. Price had been shot once in the head from a distance of more than two feet away and had died almost instantly from the wound. After investigating the scene, police noted that nothing appeared to have been taken in the encounter. Police found Price's necklace still on his neck, his watch by his wrist, his wallet, which

contained $223 [FN1], still in his pocket, and the keys to his vehicle, which was parked nearby, clutched in his right hand.

> [FN1]  It appears Price cashed in winnings totaling $397.15 at the casino, but only $223 was found in his wallet after his murder.  Police cannot explain the missing $174.15, however, the state did not present any evidence or argument at trial that the defendant took the missing money.

Shortly after midnight, Ruby Wells heard gunshots from her bedroom on Second Avenue, went to the window, and looked out. She saw a man run into her neighbor's yard, jump the fence into her yard, and run alongside her house toward her shed.  Ms. Wells called the police who subsequently searched her yard and found hidden in a broken piece of furniture a blue and red flannel shirt, a black visor, a pair of black gloves, a revolver, and a bandana.  Closer examination of the bandana revealed trace amounts of blood.  Police confiscated the items, and technicians later determined that the revolver police recovered had fired the gunshot which proved fatal for Price.

On October 26, 1998, police received word that the defendant, Shawn Higgins, and a man named Melvin Jenkins may have been involved in the killing.  Based on tips from the defendant's girlfriend and a man that had associated with the pair on the night of the murder, police obtained arrest warrants for both suspects, and both men turned themselves in during the ensuing days. ...  On January 26, 1999, after realizing that the bandana recovered near the weapon used to kill Donald Price had enough blood on it to conduct DNA testing, officers procured a warrant authorizing them to draw blood samples from both the defendant and Jenkins.  The test results indicated that the blood on the bandana matched that of the defendant.

On February 7, 2000, 17 months after Price's murder, Wanda Brown informed police that she had witnessed the killing of Donald Price.  Specifically, Brown informed JPSO Detective Michael Tucker that on the night in question she had followed the victim out of the Westbank Lounge after a night of drinking, and watched as a man approached, engaged the victim in a heated discussion, then shot him in the head.  During this meeting, Brown identified the defendant from a photographic lineup as the man she saw shoot Price and

subsequently gave police a taped statement memorializing her recollection of events.[13]

## Brady Claim

Petitioner's first claim is that the state failed to disclose to the defense evidence as required by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. When petitioner first asserted this claim in the state post-conviction proceedings, the district court denied relief, holding:

> The petitioner argues that exculpatory evidence was withheld at trial, namely that Wanda Brown, the eyewitness, was arrested for the crime of battery on a police officer but never charged by the district attorney. The police report, dated March 31, 2002, is attached to the application. The petitioner asserts that this withholding of information constituted a Brady violation.
>
> The suppression of material and exculpatory evidence by the state denies the accused due process of law. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, the failure to provide Brady material constitutes a constitutional violation only if nondisclosure deprives the accused of a fair trial. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1076) [sic]. In United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481, the Court held that evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The petitioner in this case fails to meet the Bagley materiality test.
>
> Additionally, the court notes that there is no question but that the defense was aware of the confrontation between Wanda Brown and the police. At a motion for sanctions hearing held on April 17, 2002, defense attorney Michael Rielmann asked Ms. Brown is [sic] she had recently been beaten up by the police. (Transcript, p. 25.) Factually, therefore, the record itself establishes that the defense was aware of the alleged Brady material now urged. Thus, the petitioner

---

[13] State v. Higgins, 898 So.2d 1219, 1224-25 (La. 2005) (No. 2003-KA-1980); State Rec., Vol. VII of XXV.

cannot demonstrate prejudice and the court will deny relief on this claim.[14]

Petitioner's related writ applications were then denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[15] and by the Louisiana Supreme Court on January 30, 2009,[16] without additional reasons assigned.

The AEDPA places severe limitations on this Court's review of the state court's decision rejecting petitioner's Brady claim. The United States Fifth Circuit Court of Appeals has cautioned:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a Brady violation. See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter."); Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."). Rather, [a federal court] decide[s] whether the state court's Brady determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law. Busby v. Dretke, 359 F.3d 708, 717 (5th Cir. 2004).

Dickson v. Quarterman, 462 F.3d 470, 477-78 (5th Cir. 2006). For the following reasons, it is evident that high bar has not been surmounted in the instant case.

_____

[14] State Rec., Vol. VIII of XXV, Order dated September 5, 2007, pp. 4-5.

[15] Higgins v. Cain, No. 07-KH-778 (La. App. 5th Cir. Dec. 7, 2007) (unpublished); State Rec., Vol. VII of XXV.

[16] State *ex rel.* Higgins v. State, 999 So.2d 741 (La. 2009) (No. 2008-KP-0051); State Rec., Vol. VIII of XXV.

The law regarding <u>Brady</u> claims is clear:

> A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the <u>Brady</u> duty extends to impeachment evidence as well as exculpatory evidence, and <u>Brady</u> suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor. Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, although a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The reversal of a conviction is required upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-70 (2006) (per curiam) (internal citations and quotation marks omitted). Therefore, to prevail on a <u>Brady</u> claim, the petitioner "must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment." <u>DiLosa v. Cain</u>, 279 F.3d 259, 262-63 (5th Cir. 2002).

In the instant case, petitioner offers nothing more than bald speculation that defense counsel was unaware of the information at issue. *Habeas* relief cannot be granted on such unsupported speculation. Where, as here, a petitioner presents no evidence whatsoever, such as an affidavit from trial counsel, in support of a contention that <u>Brady</u> material was in fact withheld from the defense, his claim fails at the initial prong of the <u>Brady</u> inquiry. <u>Williams v. Cain</u>, Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *5 (E.D. La. May 7, 2009); <u>Watson v. Cain</u>, Civ. Action No. 06-613, 2007 WL 1455978, at *7 (E.D. La. May 17, 2007); <u>Abron v. Cain</u>, Civ. Action No. 05-876, 2006 WL 2849773, at * 10 (E.D. La. Oct. 3, 2006); <u>Harris v. United States</u>, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that

documents were *not* withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him].), aff'd, 216 F.3d 1072 (2nd Cir. 2000); see also United States v. Avellino, 136 F.3d 249, 261 (2nd Cir. 1998); Cruz v. Artuz, 97-CV-2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002).[17]

Ineffective Assistance of Counsel

Petitioner's second claim is that he received ineffective assistance of counsel. Petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Id. at 697.

To prevail on the deficiency prong of the Strickland test, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth

---

[17] Out of an abundance of caution, the Court also notes that petitioner has not shown that Brown was promised more favorable treatment in her pending criminal charges in exchange for her testimony in the instant case. The United States Fifth Circuit Court of Appeals has noted that Brady requires disclosure of a witness's pending criminal charge only if "there was some character of promise of favorable treatment in exchange for [the witness's] testimony." Stoker v. Scott, No. 94-11089, 1996 WL 661639, at *7 n.7 (5th Cir. Oct. 25, 1996); see also United States v. Pittman, No. 95-60757, 1997 WL 73796, at *6 (5th Cir. Jan. 27, 1997) ("Even assuming the existence of pending state charges against [the witness], and assuming, further, that the [federal] Government failed to disclose the existence of such charges [in a federal prosecution], this did not constitute a Brady violation, because the defendants presented no evidence that federal authorities had the ability to influence the disposition of any pending state charges, much less any evidence that [the witness] actually received any federal assistance on those charges.").

Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

When petitioner first asserted this claim in the state post-conviction proceedings, the district court denied relief, holding:

The petitioner contends that his trial attorneys, Michael Riehlman and Linda Davis Short, were ineffective in a number of important respects. The petitioner's specific complaints are that his attorney failed to present evidence of another person's (Melvin Jenkins) guilt, failed to present an alibi defense, failed to undermine an eyewitness' identification, and failed to develop medical evidence regard [sic] the eyewitness' intoxication.

The petitioner informs the court that defense investigators were given statements by jail and prison inmates implicating Melvin Jenkins as the murderer. He asserts that his attorney should have presented these inmate's [sic] statements or testimony as evidence of Jenkins' guilt, which would have exonerated the petitioner. Counsel's decision not to present this evidence, he concludes, was ineffective assistance of counsel.

Under the standard set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and State v. Washington, 491 So.2d 1337 (La. 1986), a conviction must be reversed if the defendant proves (1) that counsel's performance fell below and objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. State v. Legrand, 2002-1462 (La. 12/3/03), 864 So.2d 89.

To be successful in arguing ineffective assistance of counsel, a petitioner must prove deficient performance to the point that counsel is not functioning as counsel within the meaning of the Sixth Amendment. A petitioner must also prove actual prejudice to the point that the results of the trial cannot be trusted. Both prongs of the Strickland test must be established before relief will be granted.

There is a strong presumption that counsel's performance is within the wide range of effective representation. Effective counsel does not mean errorless counsel and the reviewing court does not judge counsel's performance based on hindsight, but rather determines whether counsel was reasonably likely to render effective assistance. State v. Soler, 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075.

In addition to the high bar established by Strickland, the burden of proof, as in all applications for post-conviction relief, is on the petitioner. LSA-C.Cr.P. art. 930.2. This principle is counter-balanced by the strong presumption that counsel's performance is within the wide range of effective representation.

A review of the trial court record reveals that both defense attorneys trying this case were skilled and effective criminal

> advocates. Both attorneys filed a heavy number of pre-trial motions in this capital case. The petitioner was not prejudiced by their actions and strategic decisions.
>
> It was the strength of the evidence, rather than defects in counsels' performance, that led to the petitioner's conviction and sentence. The petitioner has not met his burden of proof on these claims and further discussion is not warranted.[18]

Petitioner's related writ applications were then denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[19] and by the Louisiana Supreme Court on January 30, 2009,[20] without additional reasons assigned.

Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). For the following reasons, the Court finds that neither of those conditions is met in the instant case and that, therefore, this federal court should defer to the state court's ruling.

Petitioner first claims that defense counsel was ineffective in failing to call two potential witnesses, Christopher Hill and Cedric Reed, to testify for the defense. In support of this claim, petitioner has produced written statements purportedly from those individuals in which they

---

[18] State Rec., Vol. VIII of XXV, Order dated September 5, 2007, p. 4.

[19] Higgins v. Cain, No. 07-KH-778 (La. App. 5th Cir. Dec. 7, 2007) (unpublished); State Rec., Vol. VII of XXV.

[20] State *ex rel.* Higgins v. State, 999 So.2d 741 (La. 2009) (No. 2008-KP-0051); State Rec., Vol. VIII of XXV.

state that Melvin Jenkins confessed to them that he had committed a murder for which petitioner was charged. The two statements appear to be written in the same handwriting and neither is notarized. However, even if this Court were to assume that the statements are authentic and that the individuals were referring to the murder of Donald Price, which is by no means clear,[21] petitioner has not made the required showing that Hill and Reed were available and would in fact have testified at trial in a manner beneficial to the defense. Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) (to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner must show both that the testimony would have been favorable and that the witness would have testified at trial); see also Bray v. Quarterman, 265 Fed. App'x 296, 298 (5th Cir. 2008) ("To prevail on such a claim, the petitioner must name the witness, *demonstrate that the witness was available to testify and would have done so*, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.") (emphasis added).

Additionally, "complaints of uncalled witnesses are not favored in federal *habeas corpus* review because the presentation of testimonial evidence is a matter of trial strategy ...." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009); see also Bray, 265 Fed. App'x at 298; Hinkle v. Dretke, 86 Fed. App'x 687, 688 (5th Cir. 2004). In fact, there is a "strong presumption" that counsel's failure to call a witness was a strategic decision. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984). The United States Supreme Court has cautioned courts not to second-guess

---

[21] Price is not mentioned in the affidavit. Moreover, Price's murder is not the only one with which petitioner has been charged. For example, petitioner has in fact been convicted of at least one other murder. Higgins v. Cain, 800 So.2d 918 (La. App. 5th Cir. 2001).

counsel's decisions on such matters of strategy through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. <u>Strickland</u>, 466 U.S. at 689. Moreover, it is irrelevant that another attorney might have made other choices or handled such issues differently. As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." <u>Id</u>.

Here, petitioner has presented no evidence to overcome the dual presumptions that the failure to call Hill and Reed was a strategic and reasonable decision. Further, there are numerous reasons that counsel may have made this choice, not the least of which is that both Hill and Reed have criminal records, a fact which the jurors most likely would have considered unfavorably in assessing credibility.[22] For this or any other innumerable subjective reasons, counsel might have concluded that Hill and Reed would not have been convincing witnesses and that it would be best not to call them.[23] Accordingly, this claim has no merit.

---

[22] In their affidavits, both Hill and Reed state that they were incarcerated at the time Jenkins supposedly made his confessions.

[23] Counsel is clearly allowed to make such decisions. As the United States First Circuit Court of Appeals has explained:

> The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony. The witness may not testify as anticipated or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused. Where the prosecution's case is less than

Petitioner next claims that his counsel was ineffective in failing to present an alibi defense by calling Rudolph Keller to testify that he was with petitioner around the time of the shooting. In support of this claim, petitioner offers nothing more than the affidavit of a third person, John Adcock, an investigator for the defense. This evidence, which is nothing more than rank hearsay, is clearly insufficient to show that Keller was available to testify at trial and would in fact have testified in a manner beneficial to the defense. Accordingly, petitioner has fallen far short of meeting his burden of proof to establish that counsel was ineffective for failing to call Keller.[24]

Petitioner also claims that his counsel was ineffective in failing to present evidence undermining Wanda Brown's identification. In support of this contention, petitioner claims that an

---

> compelling ..., the risk of "rocking the boat" may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony.

Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted). The court further noted:

> Reasonably competent trial counsel might well have determined that the best prospect for acquittal lay in discrediting the government's witnesses, rather than presenting additional testimony which could appear to legitimate the government's case or raise questions about the defense not previously suggested by the government's evidence.

Id.

[24] To the extent that petitioner is claiming that counsel was ineffective in failing to mount an alibi defense, he has failed to establish that any evidence, other than Adcock's inadmissible hearsay statement, existed on which a viable alibi defense could have been based. Without such evidence, there is simply no basis for a finding that defense counsel wrongly eschewed a viable alibi defense. See Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001) ("A prisoner's bald conclusory assertion that supposed 'alibi' witnesses were not called does not serve to overcome the strong presumption that his counsel's actions were reasonable.") (quotation marks omitted); Taylor v. Cain, Civ. Action No. 07-3929, 2008 WL 4186883, at *11 (E.D. La. Sept. 10, 2008). Therefore, petitioner has not established that he was prejudiced by his counsel's failure to pursue such a defense.

investigator, Colleen Francis, spoke with two individuals who cast doubt on Brown's ability to identify petitioner. Francis first claimed that she had been told by Brown's mother-in-law that Brown told the mother-in-law that she had not seen anything but that the state was trying to make her a witness. The mother-in-law also purportedly told Francis that Brown "takes medication for her nerves" and has received treatment at a mental health clinic. Francis next claimed that she was told by Brown's ex-husband that Brown was drunk when the incident occurred and had admitted that she was unsure what she had seen that night. The ex-husband also purportedly said that Brown was known to use drugs and had received mental health treatment. However, in support of this claim, petitioner's counsel presents no direct evidence from either the mother-in-law or the ex-husband to verify these purported statements. Moreover, counsel has presented no direct evidence of Brown's intoxication on the night of the incident, her history of drug use, or her mental health history or treatment. Instead, counsel presents nothing more than Francis's rank hearsay. That hearsay has no evidentiary value and is clearly insufficient to warrant *habeas* relief.

Lastly, petitioner claims that his counsel was ineffective in failing to develop medical evidence of Brown's intoxication. In support of this contention, *habeas* counsel speculates that an expert witness could have testified that Brown was too intoxicated to make an accurate identification. However, such speculation is insufficient to warrant relief. The United States Fifth Circuit Court of Appeals has noted: "[U]nsupported claims regarding [an] uncalled expert witness are speculative and disfavored by this Court as grounds for demonstrating ineffective assistance of counsel." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). Further, to show the prejudice required to support such a claim, a petitioner must show that the expert's testimony would have been

favorable.  Id.  Petitioner furnished neither the state court nor this Court with colorable evidence, such as an affidavit from such an expert, showing that an expert would have reached conclusions that were beneficial to the defense.  Therefore, the record is simply insufficient for this Court to find that trial counsel's performance was deficient or that prejudice resulted from the failure to secure such an expert witness.

In summary, it is evident that the state court identified the proper standard, i.e. the Strickland standard, and applied it in a reasonable manner.  Therefore, petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court rejects petitioner's ineffective assistance of counsel claim.

Jury Misconduct

Petitioner's third claim is that his constitutional rights were violated by the jury's consideration of evidence not admitted at trial.  When petitioner first asserted this claim in the state post-conviction proceedings, the district court denied relief, holding:

> The petitioner next complains of jury misconduct, specifically alleging that jurors discussed the meaning of teardrop tattoos.  According to the defense brief, the petitioner had teardrop tattoos on his face.
> In support of this claim, the petitioner attaches recent statements of several jurors to his petition.  Notably, all three of these statements are written in what appears to be the same handwriting.  Furthermore, none of the three jurors' "statements" are notarized.
> Inquiry into the validity of a verdict is expressly prohibited by the jury shield law, LSA-C.E. art. 606 (B).  This statute provides as follows:

B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, **a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith**, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

LSA-C.E. art. 606 (B), emphasis added.

Ac held by the Fifth Circuit Court of Appeal, this statutory bar against inquiring into jury proceedings serves the important purpose of maintaining both the confidentiality and finality of jury verdicts and of the confidentiality of the jurors' deliberations. State v. Videau, 04-923 (La. App. 5 Cir. 3/1/105), 900 So.2d 855, 863.

Pre-deliberation comments between jurors have been held to violate the judge's instructions, but not to constitute an impermissible outside influence. State v. Weaver, 917 So.2d 600, 612, 05-169 (La. App. 5 Cir. 11/29/05), writ denied, 944 So.2d 1277, 2006-0695 (La. 12/15/06). Based on Weaver and the cases cited therein, as well as the express language of the jury shield law itself, this court will deny relief.

Both factually and legally, this claim of jury misconduct comes far short of meeting the petitioner's necessary burden of proof. Based on the inadequate showing made in connection with this claim, there is no basis for post-conviction relief.[25]

---

[25] State Rec., Vol. VIII of XXV, Order dated September 5, 2007, pp. 5-6.

Petitioner's related writ applications were then denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[26] and by the Louisiana Supreme Court on January 30, 2009,[27] without additional reasons assigned.

Courts are generally barred from post-verdict inquiries into matters involving jury deliberations. The reasons for such a prohibition are obvious: "Courts properly avoid such explorations into the jury's sovereign space, and for good reason. The jury's deliberations are secret and not subject to outside examination." Yeager v. United States, 129 S.Ct. 2360, 2368 (2009) (citations omitted). This principle was codified in Federal Rule of Evidence 606(b), as well as in Louisiana Code of Evidence Article 606(B), the Louisiana article modeled on that federal rule.[28] Although this prohibition may at times lead to seemingly unjust results, the United States Tenth Circuit Court of Appeals explained the prohibition's greater purposes in its discussion of the prohibition:

> The rule against impeachment of a jury verdict by juror testimony as to internal deliberations may be traced back to "Mansfield's Rule," originating in the 1785 case of Vaise v. Delaval, 99 Eng. Rep. 944 (K.B. 1785). Faced with juror testimony that the jury had reached its verdict by drawing lots, Lord Mansfield established a blanket ban on jurors testifying against their own

---

[26] Higgins v. Cain, No. 07-KH-778 (La. App. 5th Cir. Dec. 7, 2007) (unpublished); State Rec., Vol. VII of XXV.

[27] State ex rel. Higgins v. State, 999 So.2d 741 (La. 2009) (No. 2008-KP-0051); State Rec., Vol. VIII of XXV.

[28] La.Code Evid. art. 606, Comment (b) ("Paragraph B of this Article follows Federal Rule of Evidence 606(b) with respect to criminal cases."); State v. Hailey, 953 So.2d 979, 984 (La. App. 2nd Cir. 2007) ("This article is closely related, at least in criminal cases, to Federal Rule of Evidence 606.").

verdict. The rule was adopted by most American jurisdictions and "[b]y the beginning of [the twentieth] century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." Tanner v. United States, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). This common-law principle, together with exceptions also developed by common law, was eventually codified into Federal Rule of Evidence 606(b).

Rule 606(b) is a rule of evidence, but its role in the criminal justice process is substantive: it insulates the deliberations of the jury from subsequent second-guessing by the judiciary. Jury decision-making is designed to be a black box: the inputs (evidence and argument) are carefully regulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review. Judges instruct the jury as to the law, but have no way of knowing whether the jurors follow those instructions. Judges and lawyers speak to the jury about how to evaluate the evidence, but cannot tell how the jurors decide among conflicting testimony or facts. Juries are told to put aside their prejudices and preconceptions, but no one knows whether they do so. Juries provide no reasons, only verdicts.

To treat the jury as a black box may seem to offend the search for perfect justice. The rule makes it difficult and in some cases impossible to ensure that jury verdicts are based on evidence and law rather than bias or caprice. But our legal system is grounded on the conviction, borne out by experience, that decisions by ordinary citizens are likely, over time and in the great majority of cases, to approximate justice more closely than more transparently law-bound decisions by professional jurists. Indeed, it might even be that the jury's ability to be irrational, as when it refuses to apply a law against a defendant who has in fact violated it, is one of its strengths. See John D. Jackson, Making Juries Accountable, 50 Am. J. Comp. L. 477, 515 (2002).

If what went on in the jury room were judicially reviewable for reasonableness or fairness, trials would no longer truly be by jury, as the Constitution commands. Final authority would be exercised by whomever is empowered to decide whether the jury's decision was reasonable enough, or based on proper considerations. Judicial review of internal jury deliberations would have the result that "every jury verdict would either become the court's verdict or would be

permitted to stand only by the court's leave." <u>Carson v. Polley</u>, 689 F.2d 562, 581 (5th Cir. 1982).

Defendants undoubtedly have a powerful interest in ensuring that the jury carefully and impartially considers the evidence. This case presents that interest to the highest degree. But there are compelling interests for prohibiting testimony about what goes on in the jury room after a verdict has been rendered. The rule protects the finality of verdicts. It protects jurors from harassment by counsel seeking to nullify a verdict. It reduces the incentive for jury tampering. It promotes free and frank jury discussions that would be chilled if threatened by the prospect of later being called to the stand. Finally, it preserves the "community's trust in a system that relies on the decisions of laypeople [that] would all be undermined by a barrage of postverdict scrutiny." <u>Tanner</u>, 483 U.S. at 121, 107 S.Ct. 2739; <u>see also</u> <u>Resolution Trust Corp. v. Stone</u>, 998 F.2d 1534, 1548 (10th Cir. 1993) ("[T]he rule against jurors impeaching their own verdict is designed to promote the jury's freedom of deliberation, the stability and finality of verdicts, and the protection of jurors against annoyance and embarrassment."); <u>Gov't of the V.I. v. Gereau</u>, 523 F.2d 140, 148 (3d Cir. 1975) (listing these five policies behind the rule).

Like other rules of evidence protecting the confidentiality of certain communications, such as the attorney-client privilege or the priest-penitent privilege, Rule 606(b) denies the court access to what may be relevant information – information that might, for example, justify a motion for a new trial. But like these other privileges, the rule protects the deliberative process in a broader sense. It is essential that jurors express themselves candidly and vigorously as they discuss the evidence presented in court. The prospect that their words could be subjected to judicial critique and public cross examination would surely give jurors pause before they speak. <u>See</u> <u>Tanner</u>, 483 U.S. at 120, 107 S.Ct. 2739 ("If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference.") (quoting <u>McDonald v. Pless</u>, 238 U.S. at 267-68, 35 S.Ct. 783). Moreover, part of the urgency that comes from knowing that their decision is the final word may be lost if jurors know that their reasoning is subject to judicial oversight and correction.

<u>United States v. Benally</u>, 546 F.3d 1230, 1233-34 (10th Cir. 2008).

Similarly, the United States Supreme Court has noted:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

Tanner v. United States, 483 U.S. 107, 120-21 (1987) (citations omitted).

Petitioner's claim, of course, is based on conversations which allegedly occurred *prior* to the actual deliberations. However, that distinction is of no moment. As noted by the state court, Article 606(B) has been interpreted also to encompass such pre-deliberation matters. State v. Weaver, 917 So.2d 600, 612-14 (La. App. 5th Cir. 2005).[29]

Accordingly, petitioner's evidence in support of his claim was admissible only if the alleged impropriety fell within one of the stated exceptions to the general prohibition, i.e. if it involved (1) an outside influence improperly brought to bear upon a juror or (2) extraneous prejudicial information improperly brought to the jury's attention. Here, there was no allegation of an improper "outside influence"; therefore, the Court need only consider whether the claim involves "extraneous prejudicial information."

---

[29] The same is true of the article's federal counterpart. See, e.g., United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990).

In the instant case, the jurors allegedly discussed the meaning of petitioner's teardrop tattoos and concluded that each teardrop represented a life that he had taken.[30] This Court finds that the juror's speculation on this matter did not constitute "extraneous prejudicial information" for the following reasons.

First, the information on which the speculation was based did not enter the jury room through an *external*, prohibited route such as an outside contact, communication, or publicity; rather, it was general knowledge brought to the jury room by the jurors themselves. See United States v. Brito, 136 F.3d 397, 414 (5th Cir. 1998) (a jury's verdict may be impeached only by evidence that the verdict was influenced by *outside* sources); United States v. Gonzales, No. 92-2118, 1993 WL 185718, at *7 (5th Cir. 1993) (same; noting that a juror's knowledge of Spanish, which allowed him to interpret for the other jurors part of an audiotape in evidence, stemmed from his personal experience and was therefore not from an extrinsic source); United States v. Black, 843 F.2d 1456, 1464 n.7 (D.C. Cir. 1988) ("[A] juror's affidavit is incompetent to impeach the verdict for internal error; juror affidavits may only be used for the narrow purpose of showing "extraneous influence," such as prejudicial publicity."); see also Tanner, 483 U.S. at 117-18 (discussing the history and application of the "external" versus "internal" distinction).[31]

---

[30] The parties do not dispute that this is in fact one meaning of such tattoos, and the Court notes that this interpretation has been acknowledged in prior cases. See, e.g., Henderson v. Cockrell, 333 F.3d 592, 595-96 (5th Cir. 2003); United States v. Matthews, 312 F.3d 652, 666-67 (5th Cir. 2002); Davis v. Quarterman, Civ. Action No. 2:03-CV-001, 2006 WL 2161613, at *1 n.1 (N.D. Tex. July 31, 2006), aff'd, 237 Fed. App'x 903 (5th Cir. 2007).

[31] Due to the dearth of relevant jurisprudence interpreting Article 606(B), this Court has looked to federal jurisprudence interpreting the similar federal rule. This action is clearly appropriate. See, e.g., La. Code Evid. art. 102, Comment (a) ("[T]he adoption of this Code facilitates the movement

Second, the speculation was based on the juror's general knowledge, not particularized knowledge of this petitioner or his case. See Benally, 546 F.3d at 1237 (when determining whether information constitutes improper extraneous information under the federal rule, the relevant inquiry is whether the information concerned specific facts about the defendant or the incident in which he is charged; "generalized statements, ostensibly based on the jurors' personal experience," do not support an actionable claim); Grotemeyer v. Hickman, 393 F.3d 871, 879 (9th Cir. 2004) ("The Sixth Amendment entitles a defendant to an 'impartial' jury, not to an ignorant one. That a physician is on the jury does not deprive a defendant of his constitutional right to an impartial jury, even though the physician will doubtless have knowledge and experience bearing on any medical questions that may arise."); Bibbins v. Dalsheim, 21 F.3d 13, 17 (2nd Cir. 1994) (jurors may bring to the jury room knowledge gained from their ordinary experience, such as knowledge that "Times Square is busy all night or that there are doormen along stretches of Park Avenue"); United States v. Holck, 398 F.Supp.2d 338, 364-67 (E.D. Pa. 2005) ("jurors can and should draw upon prior life experiences and use them in the course of deliberations," and "[s]uch conduct does not amount to bringing in extraneous information"), aff'd, 500 F.3d 257 (3rd Cir. 2007), cert. denied, 128 S.Ct. 1329 (2008); see also Marquez v. City of Albuquerque, 399 F.3d 1216, 1223 (10th Cir. 2005) (a juror's personal experience with training police dogs did not constitute "extraneous prejudicial information").

---

towards a uniform national law of evidence. Thus, especially where the language of the Louisiana Code is identical or virtually identical with that used by other states or in the federal rules, Louisiana courts now have available a body of persuasive authority which may be instructive in interpreting the Louisiana Code.").

In light of the foregoing, the state court correctly determined that, pursuant to Louisiana Code of Evidence Article 606(B), petitioner's evidence in support of this claim was inadmissible and his claim was not cognizable. Additionally, and even more importantly, Louisiana Code of Evidence Article 606(B) and its application by the state court was neither contrary to nor an unreasonable application of clearly established *federal* law as required for *habeas* relief. Accordingly, petitioner's claim of jury misconduct should be denied. See Salazar v. Dretke, 419 F.3d 384, 399, 403, and 403 (5th Cir. 2005) (rejecting federal *habeas* claim challenging state court's application of the similar Texas rule disallowing post-verdict inquiries of jury misconduct).

## Identification

Petitioner's fourth claim is that the trial court erred in failing to grant petitioner's motion to suppress the identification. The United States Fifth Circuit Court of Appeals has noted:

> [T]he admissibility of identification evidence is governed by a two-step analysis. Initially, a determination must be made as to whether the identification procedure was impermissibly suggestive. Next, the court must determine whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.

Herrera v. Collins, 904 F.2d 944, 946 (5th Cir. 1990) (footnote omitted). As to the second step of the analysis, the Fifth Circuit has offered the following guidance:

> In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court indicated that "reliability is the linchpin" when examining the totality of the circumstances to "determin[e] the admissibility of identification testimony." Id. at 114, 97 S.Ct. at 2253. Even an impermissibly suggestive identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability. The Supreme Court has set forth several factors to be considered when reviewing the reliability of a pre-trial identification. These factors include

> (1) the opportunity of the witness to view the
> criminal, (2) the witness's degree of attention, (3) the
> accuracy of the description, (4) the witness's level of
> certainty, (5) the elapsed time between the crime and
> the identification, and (6) the corrupting influence of
> the suggestive identification itself.

Herrera, 904 F.2d at 947.

A claim that identification testimony was unconstitutionally admitted at trial presents a mixed question of law and fact.  Id. at 947 n.3.  Therefore, this Court must defer to the state court unless the petitioner shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  For the following reasons, the Court finds that petitioner has made no such showing in this case.

On direct appeal, the Louisiana Supreme Court denied petitioner's claim, holding:

> The defendant claims that the trial court erroneously denied
> his motion to suppress, as police used a suggestive identification
> procedure to coerce Wanda Brown into identifying the defendant as
> the perpetrator.
> As a general matter, the defendant has the burden of proof on
> a motion to suppress an out-of-court identification.  La.Code Crim.
> Proc. art. 703(D).  To suppress an identification, a defendant must
> first prove that the identification procedure was suggestive.  State v.
> Prudholm, 446 So.2d 729, 738 (La. 1984).  An identification
> procedure is suggestive if, during the procedure, the witness's
> attention is unduly focused on the defendant.  State v. Robinson, 386
> So.2d 1374, 1377 (La. 1980).  However, even when suggestiveness
> of the identification process is proven by the defendant or presumed
> by the court, the defendant must also show that there was a
> substantial likelihood of misidentification as a result of the
> identification procedure.  Prudholm, 446 So.2d at 738.
> The Supreme Court held in Manson v. Brathwaite, 432 U.S.
> 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), that despite the

existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness' opportunity to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2254.

In the instant case, appellate counsel points out that Brown met with a detective for at least an hour before she identified the defendant. Although police subsequently memorialized Brown's identification of the defendant by obtaining an audiotaped statement, they did so 18 minutes after her initial identification, and over an hour-and-a-quarter after the beginning of her interview. The defendant also points out that the detective conducting the interview indicated to Brown that the suspected perpetrator would be in one of the photo arrays. However, at the suppression hearing, Brown testified that the detective at issue did not tell her which photo to choose, and that she identified the defendant on her own. Likewise, the detective who conducted the identification testified that he did not inform Brown which photo to pick, and that Brown chose the defendant's photo of her own free will without any of his guidance. Upon the trial court's review of the lineup, she found it "appropriately compiled." The court went on deny the motion to suppress, after issuing the following findings:

> [The lineup] was all black males of approximately the same age, approximately the same hairstyle. They all have moustaches, and there's nothing distinguishing about any of them that would make one pick out one over the other. I also believe that it was presented to Ms. Brown in an appropriate fashion. She indicated she was not forced, coerced or told which one to pick. She wrote on the back [of the array] that number two [killed the victim], and the officer also indicated that he did [not] force, coerce, [or] promise anything to her.

Given the above, the trial court has made a finding of fact based on testimony and an evaluation of credibility. Specifically, the trial court found credible the testimony that Brown was not forced, coerced, or told which photo to choose. In these circumstances, a reviewing court owes that determination great deference and may not overturn it in the absence of manifest error. See, e.g., State v. Bourque, 622 So.2d 198, 222 (La. 1993) (a "trial judge's ruling [on a fact question], based on conclusions of credibility and weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support the ruling."). Accordingly, the defendant has not shown that police conducted a suggestive identification, and this claim fails.[32]

In this proceeding, petitioner's discussion of his claim focuses primarily on the purported unreliability of the identification; however, that issue is relevant only on the *second* prong of the analysis. The state court found, and this Court agrees, that petitioner's claim fails on the *first* prong, i.e. petitioner has not shown that the identification procedure employed was impermissibly suggestive.[33] "If the identification procedure is not impermissibly suggestive, *the inquiry ends*." Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997) (emphasis added); see also United States v. Dailey, 208 Fed. App'x 344, 345 (5th Cir. 2006). Therefore, this Court need not, and does not, consider the second prong of the analysis in connection with this claim.

In summary, the state court identified the applicable federal standard and applied it is a reasonable manner. Therefore, petitioner cannot show that the state court's decision "was

---

[32] Higgins, 898 So.2d at 1232-33; State Rec., Vol. VII of XXV.

[33] The testimony at trial showed that the photographic line-up was conducted in a neutral manner, and that there was no suggestion that Brown should select petitioner's photograph. Petitioner offers nothing more than his own rank speculation to challenge that testimony. Moreover, although Brown was made aware that the suspect's photograph was included in the line-up, that fact did not render the procedure impermissibly suggestive. See Reese v. Cain, 265 Fed. App'x 230, 231 (5th Cir.), cert. denied, 128 S.Ct. 2908 (2008); United States v. Henderson, 489 F.2d 802, 805 (5th Cir. 1973).

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, under the deferential standard mandated by the AEDPA, petitioner's claim should be denied.

## Exclusion of Expert Testimony

Petitioner's fifth claim is that the trial court infringed upon his right to compulsory process and his right to present a defense by excluding expert testimony concerning the causes of misidentification. On direct appeal, the Louisiana Supreme Court denied that claim, holding:

> [T]he defendant claims the trial court erred in refusing to allow expert testimony concerning the causes of misidentification. Specifically, this testimony was to be offered in order to diminish the credibility of eyewitness Wanda Brown.
>
> As a general matter, under La.C.E. art. 702, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise." In reviewing an expert's qualifications, the "trial judge is vested with wide discretion in determining the competence of an expert witness. Competence of an expert witness is a question of fact to be determined within the sound discretion of the trial judge; h[er] rulings on the qualifications of expert witnesses will not be disturbed in the absence of manifest error." State v. Stucke, 419 So.2d 939, 944 (La. 1982)(citing State v. Drew, 360 So.2d 500 (La. 1978)).
>
> Under Stucke and its progeny, a trial court may exclude expert testimony regarding the reliability of eyewitness identification. Stucke, 419 So.2d at 945; see also State v. Ford, 608 So.2d 1058, 1060-1061 (La. App. 1st Cir. 1992); State v. Velez, 588 So.2d 116, 134 (La. App. 3 Cir. 1991). Because of the risk that expert testimony on eyewitness identification "will have a greater influence on the jury than other evidence presented at trial," and because such evidence presents the danger of "'invad[ing] the field of common knowledge, experience, and education of men [ ]'" this Court has held that the prejudicial impact of such evidence would substantially outweigh its probative value. Stucke, 419 So.2d at 945 (quoting 3 Am.Jur.2d,

Expert and Opinion Evidence, § 21; 100 A.L.R.2d 1421, 92 A.L.R. 1223).

   In the instant case, the defendant wished to call Dr. John C. Brigham, an expert in eyewitness identification, who would have testified regarding his findings after years of studying the reliability of eyewitness testimony. [FN7]  Specifically, Brigham sought to explain to the jury his findings that, inter alia, intoxication greatly increases the likelihood of false identification, that little correlation exists between the confidence expressed by an eyewitness and the actual reliability of that witness's identification, that the chance of misidentification increases with the length of time between incident and identification, and that facts gathered from secondary sources after observing the event in question tend to skew a witness's perception of that event.  While the defendant claims that the particular facts of this case present the rare instance in which the "'specialized knowledge' of an expert in the form of opinion evidence would assist the jury in deciding the question of identity," Stucke, 419 So.2d at 951 (Lemmon, J., concurring), with the possible exception of the effect of alcohol on Brown's ability to process the world around her, the proposed expert testimony likely presented an invasion into a reasonable juror's common knowledge.  See State v. Ammons, 208 Neb. 797, 305 N.W.2d 812, 814 (1981) (the prejudicial effect of a psychologist's testimony on a witness's identification outweighs its probative value); see also Ford, 608 So.2d at 1061 (expert testimony regarding the fallibility of human perception and memory generally is unnecessary to resolve the issues regarding the reliability of an identification); see generally Elizabeth Loftus, Eyewitness Testimony Civil and Criminal (1997).  The trial court thus properly excluded this expert testimony, and defendant's third assignment of error fails to have merit.

> [FN7] In one such study, for example, after obtaining permission from bank managers to do so, Brigham arranged for actors to present bank tellers with obviously forged checks and request that the checks be cashed.  After the tellers refused, actors argued for approximately 90 seconds and stormed out.  Later, when asked by "detectives" to identify the people

attempting to cash checks, tellers met with approximately a 48% success rate. App. at 22.[34]

The question for this Court is not whether such expert testimony was admissible but rather only whether petitioner's federal constitutional rights were violated by its *exclusion*. They were not. Although a trial judge may, as a matter of discretion, allow expert testimony regarding the reliability of eyewitness identifications, a criminal defendant has no *right* to present such testimony. See United States v. Moore, 786 F.2d 1308, 1311-13 (5th Cir. 1986) ("Although admission of expert eyewitness testimony is proper, there is no federal authority for the proposition that such testimony *must* be admitted.") (emphasis in original); see also United States v. Jackson, 50 F.3d 1335, 1340 (5th Cir. 1995); Jordan v. Ducharme, 983 F.2d 993, 939 (9th Cir. 1993); Moore v. Tate, 882 F.2d 1107, 1110-11 (6th Cir. 1989); Johnson v. Wainwright, 806 F.2d 1479, 1484-86 (11th Cir. 1986). On the contrary, "any problems with perception and memory are easily understood by jurors and can be adequately addressed through cross-examination." United States v. Moore, 786 F.2d at 1312.

In summary, as the United States Ninth Circuit Court of Appeals has explained: "There is no Supreme Court precedent recognizing a federal constitutional right to have evidence regarding the reliability of eyewitness identifications admitted at trial. ... As a result, the state trial court's decision to exclude such evidence was well within its discretion and was not contrary to or an unreasonable application of Supreme Court precedent warranting habeas relief." Cheatam v.

---

[34] Higgins, 898 So.2d at 1239-40; State Rec., Vol. VII of XXV.

Waddington, 177 Fed. App'x 716, 717-18 (9th Cir. 2006). Accordingly, petitioner's claim must be denied.

Sufficiency of the Evidence

Petitioner's sixth claim is that there was insufficient evidence to support his conviction for second degree murder. As noted, at trial, petitioner was convicted of *first degree* murder. On direct appeal, he claimed that there was insufficient evidence to support that conviction. In connection with that claim, the Louisiana Supreme Court noted:

> When reviewing the sufficiency of the evidence to support a conviction, this court is controlled by the standard set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction "the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La. 1984). Moreover, in the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 02-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79; State v. Jones, 97-2591, p. 7 (La. App. 4 Cir. 9/8/99), 744 So.2d 165, 169.[35]

Applying those standards to the evidence presented at trial, the Louisiana Supreme Court then agreed that there was insufficient evidence for a rational trier of fact to find that all of the elements of first degree murder had been proved beyond a reasonable doubt. Specifically, the court found that the state failed to prove the alleged aggravating factor, i.e. that the murder was committed during an armed robbery or attempted armed robbery, as would be necessary to support a conviction for

---

[35] Higgins, 898 So.2d at 1226; State Rec., Vol. VII of XXV.

first degree murder.  The court nevertheless found that there was sufficient evidence to support a

conviction of second degree murder, holding:

> [Brown's] identification of the defendant as the assailant in the instant case is more credible and does not suffer from the same shortcomings as her credibility regarding her interpretation of the confrontation between the defendant and victim on the night in question.  Primarily, unlike her uncorroborated statements regarding what appeared to be an armed robbery, Brown's identification of the defendant is substantiated by physical evidence, particularly the DNA evidence which, through expert testimony, linked the defendant by trace samples of blood to the bandana stashed with the murder weapon in Ruby Wells's backyard.  This evidence also bolsters Brown's explicit rejection of defense counsel's suggestion that a shorter man, namely Melvin Jenkins, was the perpetrator.
>
> Furthermore, at trial Brown gave the following testimony regarding her identification of the defendant:

| Mr. Mary: | How long did you look at it before you picked out number two [from the line-up]? |
|---|---|
| Ms. Brown: | Instantly. |
| Mr. Mary: | And the person in number two is that man right there (indicating). |
| Ms. Brown: | Yes. |
| Mr. Mary: | And, Wanda, let me ask you this.  You're witnessing these events; you've been drinking, right? |
| Ms. Brown: | Yes. |
| Mr. Mary: | Are you sure that that's the man that killed Donald Price? |
| Ms. Brown: | I'm positive. |

Brown's testimony points to her genuine belief in her identification of the defendant as the man she saw shoot Price. Further, Brown attested that despite her inebriated state at the time of the shooting, she was certain in her identification of the defendant as the shooter. Further, there is no indication that her identification of the defendant as the perpetrator was tainted by any media reports,[FN6] unlike her conclusion that the defendant was attempting an armed robbery at the time of the shooting which she admitted was influence by the newspaper and television reports. Therefore, despite the aforementioned inconsistencies in Brown's testimony with the physical evidence, which were likely the result of her alcohol consumption and which negated the credibility of her interpretation of events and the confrontation between the defendant and victim, it appears that the jury rationally accepted Brown's identification of the defendant, in part, because it was not tainted by media representations, and also since her identification was bolstered by the physical evidence.

[FN6]   In fact, at the identification suppression hearing, when asked if she had seen the defendant on any other occasion, either before or after the shooting, she answered no.  Brown also attested that she had never seen a picture of the defendant in the newspaper or on television.

Thus, while the defendant contests both of the above credibility determinations of the jury, for the reasons set out above, one such determination was rational and one was not. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." Mussall, 523 So.2d at 1310. The due process standard of review under Jackson, 443 U.S. at 319, 99 S.Ct. at 2789, does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt.  State v. Lubrano, 563 So.2d 847, 850 (La. 1990).

In this case a rational trier, viewing the evidence in the light most favorable to the state, could only speculate whether there was an attempted armed robbery at the time of the shooting.  The evidence at trial, therefore, failed to establish every element of the

charged offense and cannot support defendant's conviction for first degree murder.

        However, under <u>State v. Byrd</u>, 385 So.2d 248 (La. 1980), and La.Code Crim. Proc. art. 821(E), discharge of the defendant is neither necessary nor proper when the evidence presented at trial does not support the verdict returned but does support a responsive verdict or lesser included grade of the offense. <u>Bright</u> at p. 15, 776 So.2d at 1144; <u>State v. Hart</u>, 96-0697, pp. 16-17 (La. 3/7/97), 691 So.2d 651, 661-62. Because we find that the evidence subjected to the <u>Jackson</u> standard supports a conviction for specific intent second degree murder as provided in La. R.S. 14:30.1(A)(1), which is responsive to a charge of first degree murder, we vacate the defendant's conviction for first degree murder and sentence of death. Since, ... we find no other meritorious assignments of error, we modify the judgment of guilty of first degree murder, render a judgment of guilty of second degree murder, and remand the case to the district court for sentencing on the modified judgment as set forth in La. R.S. 14:30.1(B).[36]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Taylor v. Day</u>, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), <u>aff'd</u>, 213 F.3d 639 (5th Cir. 2000). For the following reasons, the Court finds that petitioner has made no such showing.

In this case, petitioner contends that he is innocent and was wrongly convicted based on Wanda Brown's testimony, which he vociferously argues was unreliable.[37] However, a federal

---

[36] <u>Higgins</u>, 898 So.2d at 1231-32; State Rec., Vol. VII of XXV.

[37] Rec. Doc. 1, supporting memorandum, pp. 1-9

*habeas* court does not reweigh the evidence to determine whether, in its opinion, the jury could have, or arguably should have, reached a different conclusion. Rather, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979):

> In considering challenges to the sufficiency of evidence in habeas proceedings, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Jackson, 443 U.S. at 319). Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan, 271 F.3d at 193 (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).[38]

In this case, the jurors obviously found Brown credible. Although petitioner disputes the jurors' conclusion in that regard, questions concerning credibility are generally beyond the scope of Jackson and *habeas* review. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are

---

[38] Moreover, Louisiana's circumstantial evidence standard requiring that the every reasonable hypothesis of innocence be excluded does not apply in a federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008).

to be resolved in favor of the verdict."); <u>McCowin v. Scott</u>, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the <u>Jackson</u> standard for habeas relief.").

Brown's testimony and the other evidence presented, viewed in the light most favorable to the prosecution, were sufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, this Court must defer to the state court's decision on that claim.

Actual Innocence

Petitioner's seventh claim is that his conviction is unconstitutional because evidence unavailable at trial demonstrates that he is actually innocent. When he first asserted this claim in the state post-conviction proceedings, the district court denied relief, holding:

> The petitioner contends that he is actually innocent of this murder and appears to make a post-conviction claim in this regard. The jury at the petitioner's trial resolved the question of guilt. Furthermore, the Supreme Court of Louisiana found the evidence sufficient to sustain a conviction for second degree murder. The question of guilt may not be relitigated in this collateral proceeding and is no longer before any court.
> On post-conviction review, the reviewing court is limited by claims enumerated in LSA-C.Cr.P. art. 930.3. This article allows post-conviction relief only where the conviction offends the federal or state constitution, the court exceeded its jurisdiction, the limits on institution of prosecution have expired, the statute is unconstitutional, the conviction or sentence is an ex post facto violation, or DNA testing proves by clear and convincing evidence that the petitioner is factually innocent.

In Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court of the United States held that a claim of actual innocence based on newly discovered evidence is not a ground for federal habeas relief absent an independent constitutional violation which occurred in the underlying state criminal proceeding.

In State v. Conway, 816 So.2d 290, 2001-2808 (La. 4/12/02), the Supreme Court of Louisiana reversed the granting of post-conviction relief. The Court noted that "assuming that a claim of 'actual innocence' which was not based on DNA evidence was cognizable in application for post-conviction relief," the petitioner merely claimed an alternative and inconsistent theory of defense to the one he had offered at trial. Such a claim was not a bona fide claim of actual innocence.

For these reasons, the court concludes that the petitioner is not entitled to post-conviction relief on this claim.[39]

Petitioner's related writ applications were then denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[40] and by the Louisiana Supreme Court on January 30, 2009,[41] without additional reasons assigned.

By asserting this claim in this forum, it is evident that petitioner misunderstands the essential nature of federal *habeas corpus* relief. As Justice Holmes noted long ago, what a federal *habeas* court has "to deal with is *not* the petitioner['s] innocence or guilt but *solely* the question whether [his] constitutional rights have been preserved." Moore v. Dempsey, 261 U.S. 86, 87-88 (1923) (emphasis added). The Supreme Court reiterated that view seventy years later, noting:

---

[39] State Rec., Vol. VIII of XXV, Order dated September 5, 2007, p. 3.

[40] Higgins v. Cain, No. 07-KH-778 (La. App. 5th Cir. Dec. 7, 2007) (unpublished); State Rec., Vol. VII of XXV.

[41] State *ex rel.* Higgins v. State, 999 So.2d 741 (La. 2009) (No. 2008-KP-0051); State Rec., Vol. VIII of XXV.

Claims of actual innocence based on newly discovered evidence have *never* been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. ... This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – *not* to correct errors of fact.

Herrera v. Collins, 506 U.S. 390, 400 (1993) (emphasis added); see also Kincy v. Dretke, 92 Fed. App'x 87, 92 (5th Cir. 2004); Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir. 1998); Bolton v. Cooper, Civ. Action No. 07-626, 2007 WL 2713259, at *4 (E.D. La. Sept. 14, 2007).[42]  Where, as here, a convicted inmate uncovers new evidence tending to prove his innocence, his recourse is to seek executive clemency, not federal *habeas corpus* relief.  Herrera, 506 U.S. at 417.

## Denial of Challenge for Cause

Petitioner's final claim is that the trial court erred in denying a challenge for cause of a prospective juror.  On direct appeal, the Louisiana Supreme Court denied that claim, holding:

[G]enerally, prejudice is presumed when a challenge for cause is denied erroneously and the defense exhausts all of its peremptory challenges.  State v. Howard, 98-0064, pp. 7-9 (La. 4/23/99), 751 So.2d 783, 794-95; State v. Robertson, 92-2660, pp. 2-3 (La. 1/14/94), 630 So.2d 1278, 1280-81.  An erroneous ruling depriving an accused of a peremptory strike violates his substantial rights and constitutes reversible error.  See Jacob at p. 5, 789 So.2d at 1284; State v. Hart, 96-0697, p. 7 (La. 3/7/97), 691 So.2d 651, 656; State v. Ross, 623 So.2d 643, 644 (La. 1993); State v. Bourque, 622 So.2d 198, 225 (La. 1993).

The defendant in the present case exhausted all of his peremptory challenges.  Thus, at issue is whether the defendant's

---

[42] The Court notes that petitioner argues that the decision House v. Bell, 547 U.S. 518 (2006), changes this result.  It clearly does not.  Foster v. Quarterman, 466 F.3d 359, 368 (5th Cir. 2006) ("House did not change the law to recognize the validity of stand-alone actual-innocence claims ....").

challenge for cause as to potential juror White, based on his alleged predisposition to impose the death penalty, should have been sustained by the trial judge. La.Code Crim. Proc. art. 797 sets forth several grounds for which a juror may be challenged for cause, such as when a juror is not impartial, "whatever the cause of his partiality," and when a juror "will not accept the law as given to him by the court." The court vests the trial judge with broad discretion in ruling on challenges for cause, and will only reverse such rulings when a review of the entire voir dire reveals the judge abused his discretion. State v. Ball, 00-2277, p. 11 (La. 1/25/02), 824 So.2d 1089, 1102; Robertson at p. 3, 630 So.2d at 1281.

The trial judge should grant a challenge for cause, even when a prospective juror declares his ability to remain impartial, if facts revealed from the juror's responses as a whole reasonably imply bias, prejudice or the inability to render a judgment according to the law. Ball at p. 12, 824 So.2d at 1102 (quoting State v. Hallal, 557 So.2d 1388, 1389-90 (La. 1990)). However, a refusal to disqualify a venireman on grounds he is biased does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates a willingness and ability to decide the case fairly according to the law and evidence. Howard at pp. 7-10, 751 So.2d at 795-797; Robertson, 630 So.2d at 1281. The proper standard for determining when a prospective juror should be excluded for cause because of his view on capital punishment is whether those views prevent or substantially impair the performance of his duties as a juror. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (holding that a prospective juror who would automatically vote to impose a life sentence is properly excluded for the jury); see also Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The "substantial impairment" standard applies both to those who would vote automatically against capital punishment, see Witherspoon, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, as well as those who would vote automatically for capital punishment and is [sic] unable to consider a life sentence under the facts of the particular case, also known as a "reverse-Witherspoon." State v. Divers, 94-0756, p. 8 (La. 9/5/96), 681 So.2d 320, 324 n. 5 (citing Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). Jurors who cannot consider both a life and death sentence are "not impartial," and cannot "accept the law as given ... by the court." La.Code Crim. Proc. art. 797(2), (4); State v. Maxie, 93-2158, p. 16 (La. 4/10/95), 653 So.2d 526, 534-35. Thus, a trial judge's failure to disqualify a potential juror

unable to consider as proper penalties both a sentence of life and death constitutes reversible error. Jacobs at p. 6, 789 So.2d at 1285; Divers at pp. 8-13, 681 So.2d at 324-27.

In the instant case, defendant argues that prospective juror White should have been excused for cause because he was predisposed to impose the death penalty. At the beginning of White's examination, he stated that he would wait and listen to all the evidence before making a decision as to the appropriate penalty. Further, when asked if he would automatically impose the death penalty, White responded that he would not. After the state outlined the facts of a generic first degree murder, White again reiterated that he would not make a decision regarding the penalty and "would stay down the middle" until all evidence was presented. White indicated that he would follow the law as instructed by the court regarding the imposition of sentence during the penalty phase of the trial and would consider all the evidence the court instructed him to consider.

During the defendant's examination of potential juror White, his answers became a bit more detailed as counsel's questions became more intricate and specific. The following line of questioning ensued:

Mr. Riehlmann: If you were selected and you served on this jury and you heard the testimony of the witnesses and they convinced you beyond a reasonable doubt that Shawn Higgins killed Donald Price during the course of an armed robbery, and that he did it intentionally-it was no accident, there was no heat of blood or self-defense, he killed him intentionally during the course of an armed robbery, Mr. White, do you think that the only appropriate penalty is the death penalty?

Mr. White: Yes.

Mr. Riehlmann: If you were at that point, you were convinced, in the penalty

|              |                                                      |
|--------------|------------------------------------------------------|
|              | phase, would you give any serious consideration to a life sentence? |
| Mr. White:   | To be honest, I would have to weigh the evidence that was presented to me in the penalty phase and there would be a possibility- |
| Mr. Riehlmann: | Of a life sentence?                                |
| Mr. White:   | – of a life sentence, if the evidence was presented to me was such that it would dictate that. |

Further, White indicated that he would "probably not" be able to consider a life sentence if the defendant had killed a small child, or if he had killed many people, and he would not be able to consider a life sentence for proven mass murderers such as Osama bin Laden. Defense counsel then pointed out that on a voir dire potential juror questionnaire, White circled the statement: "In a case in which the defendant is convicted of first degree murder and in which the death penalty is requested, I will always vote to impose the death penalty." When asked about the above response, White clarified his position and stated that if the evidence presented to him indicated that the death penalty was not the proper sentence, he would have "no problem going with the life sentence;" however, he did indicate that he would have difficulty in deciding that a person with other convictions for shootings should not get the death penalty.

White also stated that the defendant would have to prove to him "beyond a doubt, beyond a shadow of a doubt" that a hypothetical defendant proven guilty of murder with other murder convictions should not get the death penalty. He further explained:

Well, I believe in the court system, it's your job to prove to me why the client should not get a certain penalty, just like with the District Attorney, it's his position to prove that the death penalty is what he should receive.

Defense counsel then asked White whether he would still be able to consider a life sentence if the state were to put on evidence of aggravating circumstances, but the defense chose not to present any evidence regarding mitigating circumstances, to which White responded he could not consider a life sentence in such a circumstance.

Over defense counsel's objection, the trial court denied the defense challenge for cause, because, when looking at the whole voir dire, the trial court thought White "could be fair." The defendant subsequently exercised a peremptory challenge to remove White.

Since the reviewing court is charged with determining whether the trial judge's denial of a defense challenge for cause was an abuse of the trial court's broad discretion, the reviewing court should scrutinize the entire voir dire record as a whole. State v. Cross, 93-1189, pp. 6-7 (La. 6/30/95), 658 So.2d 683, 686-87. Upon a review of White's responses during the entire voir dire, we find no abuse of the trial judge's discretion in refusing to grant the defendant's challenge for cause. White responded to the state's questioning that he would listen and consider both the aggravating and mitigating circumstances and in an appropriate case return a life sentence. Later, when questioned by defense counsel, White indicated there were some situations in which he would "probably not" be able to consider a life sentence. However, when asked by defense counsel if he would consider mitigating circumstances, as required by law, White replied he would. Nevertheless, White indicated that in the absence of mitigating circumstances, he would be unable to impose a life sentence in certain circumstances. Defendant argues that such statements indicate White was substantially impaired in his ability to perform his duties as a juror in accordance with his instructions and oath in regards to the penalty phase of the trial, and therefore, should have been removed for cause. However, a defendant does not begin the penalty phase of a capital case with a presumption that either a death or a life sentence is the proper punishment. State v. Lucky, 96-1687, p. 6 (La. 4/13/99), 755 So.2d 845, 850. Louisiana law does not provide any standard for a juror to weigh mitigating circumstances against aggravating circumstances, but rather simply requires the finding of an enumerated aggravating circumstance by the jury to impose the death penalty and also requires that each juror consider any mitigating circumstances presented, if any, by the defense before deciding to recommend a sentence of death. Id.; see also State v. Strickland, 94-0025, pp. 48-49 (La. 11/1/96), 683 So.2d 218, 238; La.Code Crim.

Proc. art. 905.3. Thus, White's statement regarding his requirement of mitigating circumstances for a consideration of a life sentence does not offend the law. While Louisiana law requires the consideration of mitigating circumstances by the jury when presented to them during the trial, it does not require the jurors to consider a life sentence if no mitigating circumstances are offered by the parties in regards to sentencing. See Lucky at pp. 6-7, 755 So.2d at 850.

Furthermore, this court has stated that personal predispositions of potential jurors "do not offend the law, provided that they do not 'substantially impair' the juror's duty to follow the law." Lucky at p. 7, 755 So.2d at 850. Jurors often have their own predispositions or leanings in favor of a particular penalty, and not every predisposition rises to the level of substantial impairment, and the critical determination of whether such predisposition constitutes substantial impairment is within the providence of the trial judge's discretion. Id. In State v. Lucky, this court recognized that:

> [w]hen the trial judge throughout the voir dire demonstrates an awareness of the proper legal standard, and when there is nothing in the record of the voir dire that, taken as a whole, shows a substantial impairment of the prospective juror, a reviewing court should defer to the trial judge's determination with respect to challenges for cause. While the reviewing court must carefully review the record of voir dire for abuses of discretion, it need not and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify either qualification or disqualification.

Id. at pp. 7-8, 755 So.2d 850-51.

In the instant case, the trial judge perceived the whole of White's responses to mean that he could be fair and would look at all evidence presented, including any mitigating evidence, prior to imposition of sentence. Although potential juror White indicated in certain circumstances it would be difficult to impose a life sentence over capital punishment, with exception to the mass murderer scenario, he never indicated that he would not consider the imposition of both life and death and follow the letter of the law as required by his oath and duty. On this record of the voir dire, taken

as a whole, we cannot say the trial judge abused his discretion in making the determination that White could be fair.

Furthermore, neither the court, the prosecutor, nor the defense counsel found it necessary to rehabilitate potential juror White after defense counsel elicited the responses in question. In fact, the prosecutor even asked defense counsel during a bench conference whether or not he had asked White if his "leaning" towards the death penalty would substantially impair his ability to follow the law, to which defense counsel answered no. Both the state and the trial court seemed confident that White could follow the law as instructed, and the lack of an attempt at additional rehabilitation does not appear to be an abuse of the trial judge's discretion. See Ball at p. 23, 824 So.2d at 1110.

In addition, we question the propriety of defense counsel's questioning of potential juror White in regards to the presentation of mitigating circumstances. White had already answered that he would consider any mitigating evidence presented during the penalty phase when defense counsel asked White about the imposition of a life sentence absent the presentation of any mitigating circumstances. Defense counsel seems to be suggesting that the same burden of proof which exists during the guilt phase, also exists during the penalty phase, specifically that the state must prove the defendant does not deserve a life sentence, but rather a sentence of death. However, this suggestion is contrary to Louisiana law which does not provide any standard for a juror to weight mitigating circumstances against aggravating circumstances. Lucky at p. 6, 755 So.2d at 850. The state merely has to prove the existence of one aggravating circumstance beyond a reasonable doubt to impose a death sentence, while the jury must then only consider any mitigating circumstances presented to it. La.Code Crim. Proc. art. 905.3. Thus, it appears that defense counsel's question may have actually been misleading to the juror regarding the standard for sentencing, and therefore should not have played a large factor in the trial court's determination of the juror's ability to follow the law.

Hence, for the aforementioned reasons, the trial judge did not abuse her wide discretion in determining that prospective juror White could be impartial and follow the duties and instructions of a juror.[43]

---

[43] Higgins, 898 So.2d at 1235-39; State Rec., Vol. VII of XXV.

This Court need not determine whether White should have been excused for cause, because petitioner's claim clearly fails for a different reason. Where a challenged juror is removed by use of a peremptory challenge after the denial of a challenge for cause, a petitioner is entitled to federal *habeas corpus* relief only if he demonstrates that the jury ultimately selected to try the case was not impartial. Ross v. Oklahoma, 487 U.S. 81, 85-86 (1988). Because defense counsel used a peremptory challenge to strike White and because petitioner fails even to allege in this proceeding that the jury ultimately selected was not impartial, his claim necessarily fails. Dorsey v. Quarterman, 494 F.3d 527, 533 (5th Cir. 2007), cert. denied, 128 S.Ct. 1444 (2008); Lagrone v. Cockrell, No. 02-10976, 2003 WL 22327519, at *12 (5th Cir. Sept. 2, 2003); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *12 (E.D. La. July 16, 2009).

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition of **Shawn Higgins** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[44]

New Orleans, Louisiana, this fifteenth day of December, 2009.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[44] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.